# No. 26-1361

# United States Court of Appeals
## FOR THE FIRST CIRCUIT

CHIBUIKE IGWENAGU; BRANDON HASTINGS,
on behalf of themselves and all others similarly situated,

*Plaintiffs - Appellees,*

v.

BIMBO BAKERIES USA, INC.;
BIMBO FOODS BAKERIES DISTRIBUTION, LLC,

*Defendants - Appellants.*

On Appeal from the U.S. District Court
for the District of Massachusetts

## BRIEF OF APPELLEES

ZACHARY L. RUBIN
ZLR LITIGATION, PLLC
456 Glenbrook Road Suite 11 #368
Stamford, CT 06906
T. 203-212-9983

RAVEN MOESLINGER
ORTIZ & MOESLINGER, P.C.
One Boston Place Suite 2600
Boston, MA 02108
T. 617-338-9400

*Counsel for Chibuike Igwenagu
and Brandon Hastings*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION ................................................................................... 1

STATEMENT OF THE ISSUES ............................................................ 5

STATEMENT OF THE CASE .............................................................. 6

I.    Statutory background ................................................................. 6

II.   Factual background ................................................................... 7

III.  Procedural History .................................................................. 10

SUMMARY OF THE ARGUMENT ..................................................... 12

STANDARD OF REVIEW .................................................................. 15

ARGUMENT ....................................................................................... 16

I.    Mr. Igwenagu's Distribution Agreement Is a "Contract of
      Employment" Under Section 1 ................................................ 16

      A.    The Supreme Court has Repeatedly Rejected Efforts to
            Narrow Section 1's Reach ................................................ 16

      B.    Corporate Form Is Not the Test – Substance Controls ........ 18

      C.    Bimbo's Concession as to Hastings Confirms That Corporate
            Form Is Irrelevant ........................................................... 20

      D.    Bimbo's Textual Argument Fails for the Same Reason New
            Prime's Did ...................................................................... 21

      E.    Bimbo's Cases Are Distinguishable. They Involved Corporate
            Entities With Substantial Workforces Suing As Plaintiffs,
            Not Individual Workers. ................................................... 24

**Page**

F.     *Silva* Is Directly on Point, Correctly Decided, and Should be Adopted by This Court ........................................................28

G.     Bimbo's Classification of Mr. Igwenagu as an Independent Contractor Also Dooms Its Position.....................................31

II.   The Arbitration Agreement Signed By Hastings Is Part of His Distribution Agreement, Not The Settlement Agreement —Either Way, Both Are Contracts of Employment.....................................32

A.     The Arbitration Agreement is Part of Hastings' Distribution Agreement, Not His Settlement Agreement ........................32

B.     Even If the Arbitration Agreement Were Part Of The Settlement Agreement, It Would Still Constitute A Contract of Employment ....................................................................38

CONCLUSION ......................................................................................43

CERTIFICATE OF COMPLIANCE.......................................................44

CERTIFICATE OF SERVICE...............................................................45

CASES

*Adler v. Gruma Corp.,*
135 F.4th 55 (3d Cir. 2025) ..........................................................26

*Aldea-Tirado v. PricewaterhouseCoopers, LLP,*
101 F.4th 99 (1st Cir. 2024) ........................................................16

*Amos v. Amazon Logistics, Inc.,*
74 F.4th 591 (4th Cir. 2023)............................................ 14, 24, 25, 30

*Bissonnette v. LePage Bakeries Park St., LLC,*
601 U.S. 246 (2024) ........................................................ 7, 17, 28

*Canales v. CK Sales Co., LLC,*
67 F.4th 38 (1st Cir. 2023) ..................................................... passim

*Connell v. Meritor Sav. Bank,*
No. 90–5916, 1991 WL 25715 (E.D. Pa. 1991)..............................37

*Circuit City Stores, Inc. v. Adams,*
532 U.S. 105 (2001) ........................................................... 6, 23

*Cunningham v. Lyft, Inc.,*
17 F.4th 244 (1st Cir. 2021). ........................................................15

*Dansko Holdings v. Benefit Tr. Life Ins. Co.,*
991 F.3d 494 (3d Cir. 2021).........................................................36

*Detroit Pub. Schs. Program Mgmt. Team v. Valley Forge Ins. Co.,*
483 F. App'x 150 (6th Cir. 2012) ................................................33

*Fed. Ins. Co. v. Commerce Ins. Co.,*
597 F.3d 68 (1st Cir. 2010).........................................................34

*First Options of Chicago, Inc. v. Kaplan,*
514 U.S. 938 (1995) ..................................................................33

*Fli-Lo Falcon LLC v. Amazon.com, Inc.,*
97 F.4th 1190 (9th Cir. 2024) ...................................................... 14, 24

*Fli-Lo Falcon, LLC v. Amazon.com Inc.,*
*No.* C22-441-RSM-MLP,
2022 WL 4451273 (W.D. Wash. Sept. 8, 2022) ................................. 25

*Flowers Foods, Inc. v. Brock,*
146 S. Ct. 1358 (2026) ........................................................... passim

*Gillispie v. Village of Franklin Park,*
405 F. Supp. 2d 904 (N.D. Ill. 2005) .................................................. 41

*Harrington v. Atlantic Sounding Co.,*
602 F.3d 113 (2d Cir. 2010) ................................................. 39, 40, 41

*Holsum de P.R., Inc. v. Compass Indus. Grp. LLC,*
No. 3:18-cv-02004-JAW, 2022 WL 3313742 (D.P.R. Aug. 11, 2022) ... 34

*In re Grice,*
974 F.3d 950 (9th Cir. 2020) .......................................................... 23

*In re United Bancroft Hotel Co.,*
86 F. Supp. 690, 692 (D. Mass. 1949) .............................................. 36

*King v. Putnam Inv. Co.,*
248 U.S. 23 (1918) ....................................................................... 19

*Martins v. Capstone Logistics, LLC,*
No. 1:24-cv-10357-MJJ, 2026 WL 252401 (D.Mass. Jan. 30, 2026) .... 26

*New Prime Inc. v. Oliveira,*
586 U.S. 105 (2019) ............................................................. passim

*NSTAR Elec. Co. v. Department of Public Utilities,*
968 N.E.2d 895 (Mass., 2012) .................................................. 33, 36

*Oliveira v. New Prime, Inc.,*
141 F. Supp. 3d 125 (D. Mass. 2015) .................................................. 19

*Oliveira v. New Prime, Inc.,*
857 F.3d 7 (1st Cir. 2017)...................................................................38

*Owen v. Dudley & Michener,*
*217 U.S. 488 (1910)*............................................................................19

*Peltier v. Lepage Bakeries Park St. LLC,*
2025 WL 871603 (D.R.I. Mar. 20, 2025*)* ............................................27

*Peltier v. Lepage Bakeries Park St. LLC,*
2025 WL 1285992 (D.R.I. May 2, 2025).............................................27

*Porteous v. Flowers Foods, Inc.,* 766
F. Supp. 3d 1093 (D. Or. 2025).......................................................26

*Schmidt Baking, LLC v. Silva,*
No. 25-1124, 2026 WL 1377157 (U.S. May 18, 2026) ..........................2

*Schreiber v. K-Sea Transport Corp.,*
879 N.E.2d 733 (N.Y. 2007)................................................... 39, 40, 41

*Silva v. Schmidt Baking Distribution, LLC,*
162 F.4th 354 (2d Cir. 2025) ...................................................... passim

*Silva v. Schmidt Baking Distribution, LLC,*
732 F. Supp. 3d 194 (D. Conn. 2024*)* ...............................................27

*Stinnett v. Damson Oil Corp.,*
648 F.2d 576 (9th Cir.1981) .............................................................37

*Sw. Airlines Co. v. Saxon,*
*596 U.S. 450 (2022)* .................................................................... 17, 22

*Terrebonne v. K-Sea Transp. Corp.,*
477 F.3d 271 (5th Cir. 2007) ............................................................40

*Waithaka v. Amazon.com, Inc.,*
   966 F.3d 10, 13 n. 2 (1st Cir. 2020)......................................................16

*Williams v. Cigna Financial Advisors, Inc.,*
   56 F.3d 656 (5th Cir. 1995) ....................................................................39

*Willis v. Dean Witter Reynolds, Inc.,*
   948 F.2d 305, 311 (6th Cir. 1991) .......................................................23

**STATUTES**

Federal Arbitration Act
   9 U.S.C. § 1 ......................................................................................6, 11
   9 U.S.C. § 2 ............................................................................................6

Indian Appropriations Act
   25 U.S.C. § 71 ....................................................................................23

Sherman Antitrust Act
   15 U.S.C. § 1 .....................................................................................23

Transportation Act, 1920, ch. 91, § 400, 41 Stat. 456 ..........................23

**OTHER AUTHORITIES**

Webster's New International Dictionary (1923)....................................24

**INTRODUCTION**

The Federal Arbitration Act's Section 1 exemption excludes "contracts of employment of" transportation workers from its reach. Both Plaintiffs here – Mr. Igwenagu and Mr. Hastings – personally performed delivery work for Bimbo 50 to 60 hours a week, driving the same routes, delivering the same products, to the same retail customers. This Court has already held that workers doing exactly that work are transportation workers exempt from the FAA. *Canales v. CK Sales Co., LLC*, 67 F.4th 38 (1st Cir. 2023). The question on appeal is whether the exemption is defeated because Igwenagu signed his agreement through a single-member LLC rather than in his own name. Under *New Prime Inc. v. Oliveira*, 586 U.S. 105 (2019), it is not.

In *New Prime*, the Supreme Court found that when the FAA passed, "employment" meant "[w]ork **or business** of any kind" and it included "[a] person's regular occupation **or business.**"  586 U.S. at 114, n. 1 (quoting various early 20th century dictionaries) (emphasis added).  "Congress used the term 'contracts of employment' in a broad sense to capture ***any contract*** for the performance of *work* by *workers*"[1] – the focus is on the performance of work, not on whether the worker presents as a business or not, not on how the agreement is labeled, and not on whether the worker is classified as an employee or an independent contractor. *New Prime* itself is exemplary of this substance-over-form approach: the Supreme

---

[1]      *Id*. at 115 (emphasis supplied in part)

Court held that an independent-contractor agreement constitutes a "contract of employment" within the meaning of Section 1, notwithstanding that the agreement there was entered into by the transportation worker's LLC rather than by the worker individually. *New Prime*, 586 U.S. at 114; pp. 18-19, *infra*.[2]

The Second Circuit has aptly explained the import of *New Prime*: "[f]ollowing the clear instruction of the Supreme Court in *New Prime*, [courts must look] to the substance of an agreement, not its formalities, to determine whether it is a 'contract of employment.'" *Silva v. Schmidt Baking Distribution, LLC*, 162 F.4th 354, 362 (2d Cir. 2025), *cert. denied sub nom. Schmidt Baking, LLC v. Silva*, No. 25-1124, 2026 WL 1377157 (U.S. May 18, 2026). In *Silva*, a similar case involving bread delivery drivers, the Second Circuit rejected Bimbo's proposed corporate-form rule:

> *New Prime's* holding that "contract of employment" was not, in 1925, "a term of art bearing some specialized meaning," but rather a capacious term referring to "nothing more than an agreement to perform work" leaves little room to exclude a contract from the § 1 exception solely because it is between businesses. *New Prime*, 586 U.S. at 114, 139 S.Ct. 532. Indeed, judicial opinions from the time of the FAA's enactment provide numerous and diverse examples of courts using the term "contract of employment" ***to refer to contracts for work between business entities; these include contracts between corporations, partnerships, and labor unions***. As such, we cannot conclude that a contract is not a "contract of employment" merely because it is signed by business entities. A careful reading of the statute's text confirms this conclusion. Congress specifically enacted the phrase "contracts of employment *of*" workers, not "contracts of employment *with*"

---

[2] The Supreme Court also gave the example of a tribal national employing a law firm with multiple partners for legal services as a "contract of employment" as evidence that "early 20th century cases used the phrase 'contract of employment' to describe work agreements involving independent contractors" (i.e., independent businesses). *Id*. at 115, n. 2 (citations omitted).

workers.  Had Congress intended to omit contracts between business entities from the § 1 exception, it could easily have done so.

*Silva*, 162 F.4th at 360–61 (emphasis added).

*Silva* is directly on point, correctly decided, and this Court should extend its application here.  Pursuant to his Distribution Agreement and *Canales*, Mr. Igwenagu performed exempt transportation work.  Under *New Prime* and *Silva*, that alone renders him exempt from the FAA's strictures.

Furthermore, Bimbo's own appeal is a paradigmatic example of the fallacy of elevating formalities over substance. Bimbo no longer argues that Hastings' Distribution Agreement, signed in his individual capacity, falls outside Section 1.[3] It cannot — Hastings is plainly a transportation worker performing exempt work. But that silence is dispositive with respect to both Plaintiffs: both Hastings' and Igwenagu's agreements require identical work.  If Hastings' agreement is a contract of employment, there is no principled reason to reach a different conclusion as to Igwenagu's agreement.

Bimbo also sidesteps a critical hole in its position.  In *New Prime*, the Supreme Court held that "contracts of employment" included independent contractor arrangements.  Bimbo's contract with Igwenagu purports to create an independent contractor relationship.  Bimbo cannot have it both ways:  if it wants

---

[3]     Bimbo argued as much to the District Court and has abandoned this position on appeal.

to take the position that Igwenagu's contract sets up an independent contractor arrangement, its appeal is easily sunk by *New Prime*'s holding.

In response, Bimbo relies on authority that bears no resemblance to the facts of this case. The cases Bimbo relies upon most heavily involved corporate entity-plaintiffs with separate and robust workforces seeking to invoke *a worker exemption* for the corporate entity – that is <u>not</u> this case. Plaintiffs here are natural persons and laborers – who this Court has already held in *Canales* are transportation workers (67 F.4th 38) – not corporate entities. As much as Bimbo may seek to give the impression that "Cee Distribution LLC" is a plaintiff in this action, it is not. The two individual worker Plaintiffs – Mr. Igwenagu and Mr. Hastings — personally performed the delivery services at the heart of this case and are suing in their individual capacities.

Next, perhaps understanding *New Prime*'s reach, Bimbo seeks to evade its holding by doing precisely what the defendant there did – attempting to "shift the debate" away from the meaning of "contracts of employment."[4] Bimbo fixates on the word "of" in Section 1, arguing that a contract falls within the exemption only if it is signed directly by an individual transportation worker. That argument is irreconcilable with *New Prime's* substance-over-form approach. It also ignores basic principles of grammar and statutory construction. As the Second Circuit explained,

---

[4] *New Prime*, 586 U.S. at 116.

"Congress specifically enacted the phrase 'contracts of employment of' workers, not 'contracts of employment with' workers." *Silva*, 954 F.3d at 360. Section 1 thus describes a category of exempt contracts; it does not prescribe who must sign them. Therefore, as in *New Prime*, a contract may be a "contract[] of employment of" a transportation worker even if it is executed through a corporate entity.

As to Hastings, Bimbo's argument that the Settlement Agreement falls outside Section 1 is a red herring. The Settlement Agreement did not incorporate an arbitration clause into the agreement. Rather, the parties expressly agreed to amend Hastings' Distribution Agreement by adding the arbitration clause attached as Exhibit A to the Settlement Agreement. But, attaching a document as an exhibit does not make it an operative provision of the agreement to which it is attached. By its own terms and under settled incorporation rules, the arbitration clause became part of the Distribution Agreement (via an explicit amendment) – not the Settlement Agreement. And the Distribution Agreement is, as Bimbo quietly concedes, indisputably a contract of employment. The district court correctly recognized that reality, and Bimbo offers no basis for concluding otherwise.

## STATEMENT OF THE ISSUES

1. Whether a distribution agreement under which an individual transportation worker personally performs 50 to 60 hours of delivery work per week constitutes a "contract of employment" under Section 1 of the Federal Arbitration Act, where the worker signed the agreement through a single-member LLC per his employer's

requirement, personally guaranteed performance, and personally performed all contracted-for work.

2. Whether an arbitration clause appended as an exhibit to a settlement agreement – where the settlement agreement expressly recites that the parties entered it to amend the worker's existing distribution agreement to incorporate the arbitration clause, and where the integration clause confirms the settlement agreement otherwise leaves the distribution agreement intact — is part of the distribution agreement (a conceded contract of employment under Section 1) rather than the settlement agreement.

## STATEMENT OF THE CASE

## I. Statutory Background

The Federal Arbitration Act directs courts to enforce arbitration agreements. 9 U.S.C. § 2. Section 1 of the FAA, however, exempts from the statute's coverage "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. The Supreme Court has held that this exemption covers "contracts of employment of transportation workers," *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001), and that the phrase "contract of employment" broadly means any "agreement to perform work," including agreements with independent contractors. *New Prime*, 586 U.S. at 114.

Thereafter, in *Canales*, this Court held the precise kind of bread distributors at issue here are transportation workers who cannot be compelled to arbitrate. *See Canales v. CK Sales Co., LLC*, 67 F.4th 38 (1st Cir. 2023), cert. denied, 144 S. Ct.

1391 (2024).  Most recently, the Supreme Court unanimously held that a bakery distributor who transports goods on the intrastate leg of an interstate journey is a worker "engaged in interstate commerce for purposes of § 1" even though he never crosses state lines or interacts with vehicles that do. *Flowers Foods, Inc. v. Brock*, 608 U.S. \_\_\_,146 S. Ct. 1358, 1363 (2026). *Brock* is the second unanimous Supreme Court opinion in recent years rejecting bakery delivery companies' efforts to narrow the scope of the Section 1 exemption for the same class of bread delivery workers.  *See Bissonnette v. LePage Bakeries Park St., LLC*, 601 U.S. 246, 256 (2024).  "In each case, [the Supreme Court has] rejected efforts to cabin its reach." *Brock*, at 1363.

## II.    Factual Background

Defendants are in the business of distributing bakery products—including bread, pastries, and other baked goods—to retail stores, institutions, restaurants, and other food service establishments throughout Massachusetts.  JA10, 162. Defendants distribute well-known brands including Arnold, Sara Lee, Thomas', Entenmann's, Stroehmann, Nature's Harvest, and many others. JA10.

Plaintiffs and other similarly situated individuals have worked as delivery drivers for Defendants, delivering bakery products from Defendants' warehouse and distribution facilities in Massachusetts to various customers of Defendants, including large retailers who contract directly with Bimbo for the delivery of

Bimbo's products. JA10. Defendants classified Plaintiffs and other delivery drivers as independent contractors (referred to by Bimbo as "Independent Distributors" or "IDs") rather than employees. JA 57, Igwenagu Distribution Agreement; JA89, Hastings Distribution Agreement; JA162, Hastings Decl. at ¶ 10; JA175, Igwenagu Decl. at ¶ 12.

Plaintiff Hastings has worked as a delivery driver for Defendants for approximately twenty years, beginning in approximately 2005. JA161, Hastings Decl. ¶ 3. He executed the operative Distribution Agreement with Bimbo's predecessor, George Weston Bakeries Distribution, Inc., in August 2007. R&R at 2, JA87, JA104. Hastings signed that Distributor Agreement **in his individual capacity** and has never been affiliated with any business entity or LLC during his entire tenure with Defendants. JA87, 104, 164, Hastings Decl. ¶¶ 18–19. Plaintiff Igwenagu has worked as a delivery driver for Defendants from approximately November 2019 to the present. JA173, Igwenagu Decl. ¶ 3. Mr. Igwenagu signed his Distribution Agreement in the name of his LLC, but personally guaranteed and performed all the work required under it. JA85, Igwenagu Distribution Agreement; JA173, Igwenagu Decl. at ¶ 11.

Plaintiffs personally spend approximately 50 to 60 hours per week driving delivery routes to deliver goods in trucks to stores. JA174, Igwenagu Decl. ¶ 10; JA162, Hastings Decl. ¶ 8. Both Plaintiffs perform the same job—the only

difference between them that is material to this appeal is that Igwenagu's Distribution Agreement was signed in the name of his LLC rather than in his own name. As this appeal demonstrates, Bimbo's own brief effectively concedes that Hastings's individual-capacity agreement is a contract of employment, exposing Bimbo's corporate-form theory as turning entirely on that single formal difference.

Defendants admittedly employ other workers who perform the same or substantially similar delivery duties as Plaintiffs but classify them as employees rather than independent contractors. JA167-68, Hunt Decl. ¶¶ 10-17. These properly classified employees work out of the same warehouse facilities as Plaintiffs and other misclassified workers in Massachusetts. JA11. For example, Plaintiff Hastings works out of Bimbo's Wilmington, Massachusetts distribution facility alongside other delivery drivers who Bimbo admits are employees and classifies as such. JA162, Hastings Decl. at ¶ 5.

Despite Bimbo's classification of Plaintiffs as independent contractors, Defendants exercise substantial control over Plaintiffs' work. *See* JA12-14(ECF 1) at ¶¶ 27–38. Under Bimbo's Distributor Agreements and in practice, Defendants determine Plaintiffs' delivery routes and schedules, set delivery windows and require Plaintiffs to adhere to specific time constraints, require Plaintiffs to follow specific protocols for handling, delivering, and merchandising of bakery products, set Plaintiffs' compensation rates without negotiation, and subject Plaintiffs to

performance evaluations and quality control measures. *See* JA12-14 (ECF 1) ¶¶ 31–38; JA163, Igwenagu Decl. at ¶¶ 11–19; JA174-76, Hastings Decl. at ¶¶ 11–17; JA168-69, Hunt Decl. at ¶¶ 22–30.

Historically, Bimbo and its predecessor companies classified workers as employees, but began transitioning to a dual classification system in the mid-1990s. JA167, Hunt Decl. at ¶ 4. The purpose of Bimbo shifting its model is simple: reducing labor costs and evading their legal obligations.  JA16.

Since that time, there have been several findings that Bimbo's classification of its workers as independent contractors fails under an "ABC" employment classification test. JA7 (ECF 1) at ¶¶ 2–3 (collecting opinions). Yet Bimbo continues its misclassification scheme by, among other violations, denying workers overtime pay, imposing unlawful deductions, and shifting ordinary business expenses onto workers. JA16, 19-20 at ¶¶ 48–49, 61-77.

## III.    Procedural History

Plaintiffs filed this putative class action in the District of Massachusetts in May 2025, asserting claims under the Massachusetts Wage Act and for unjust enrichment arising from Defendants' misclassification of Plaintiffs as independent contractors. ECF 1. On July 7, 2025, Defendants moved to compel arbitration and stay proceedings or, in the alternative, to dismiss Counts III and IV. ECF 14 (JA224, et seq.). Plaintiffs opposed, ECF 18 (JA138, et seq.), and Defendants

replied, ECF 21 (JA177, et seq.). On December 8, 2025, the motion was referred to Chief Magistrate Judge Hennessy.  ECF 22.

On March 16, 2026, Judge Hennessy issued an Order and Report and Recommendation denying Defendants' motion to compel arbitration and recommending denial of the motion to dismiss. ADD1, ECF 28 ("R&R"). Applying *New Prime*, the court held that both Plaintiffs' agreements are "contracts of employment" of transportation workers engaged in interstate commerce and therefore exempt from the FAA under Section 1. ADD9-10, R&R at 9–10 n. 4. The court also held that Hastings' Settlement Agreement, by its express terms, amended his Distribution Agreement to incorporate the arbitration provision and thus "is integrated into the original distribution agreement" which is a contract of employment under Section 1. *Id*.  The Defendants objected to the Report and Recommendation.  ECF 30 (JA194, et seq.).

On March 31, 2026, the district court adopted the Report and Recommendation and overruled Defendants' objections.  ECF 31, ADD28. Defendants noticed this interlocutory appeal pursuant to 9 U.S.C. § 16(a)(1) on April 6, 2026.  ECF 32.

On May 21, 2026, the district court vacated its order adopting the Report and Recommendation on grounds that *Peltier v. LePage Bakeries Park St*., LLC – also pending in this Court – "will likely be determinative, in whole or in substantial

part, of the Court's resolution of Defendants' Motion to Compel Arbitration and Stay Proceedings [ECF No. 14] and Defendants' Objections to the Report and Recommendation [ECF No. 30]." ECF 34.[5]

## SUMMARY OF THE ARGUMENT

The FAA's Section 1 exemption covers "contracts of employment of" transportation workers. The Supreme Court has construed that phrase in four unanimous decisions and has "rejected efforts to cabin its reach" in each. *Flowers Foods, Inc. v. Brock*, 146 S. Ct. 1358, 1363 (2026). Bimbo's appeal presents two more such efforts. Both fail.

**First,** Igwenagu's Distribution Agreement is a contract of employment. In *New Prime*, the Supreme Court held that "contracts of employment" means "nothing more than an agreement to perform work" and that the exemption turns on "the performance of work by workers" — not on corporate form, contractual labels, or how a worker is classified. 586 U.S. at 114, 116. Under Igwenagu's Distribution Agreement, he personally performed 50 to 60 hours of delivery work per week. That is a contract of employment. The name on the contract does not change the analysis.

---

[5]      After the district court vacated the order, the parties conferred as to any impact on the pending appeal and concluded that it likely did not alter this Court's jurisdiction over the appeal. *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982) ("[t]he filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal").

Bimbo's implicit concession as to Hastings confirms this. Bimbo does not argue on appeal that Hastings' Distribution Agreement – signed individually – falls outside Section 1. Nor can it: Hastings performs identical, exempt transportation work under a materially identical agreement. The only difference is that Igwenagu's contract bears the name of his single-member LLC. Under *New Prime*'s substance-over-form directive, that distinction is legally irrelevant: two workers doing the same job cannot have different rights under Section 1 based solely on the name printed on their paperwork.

*New Prime* itself forecloses Bimbo's argument. The contract in *New Prime* ran between two business entities — New Prime, Inc. and the worker's LLC — and the Supreme Court held it a "contract of employment" without pausing over corporate form. The Second Circuit in *Silva v. Schmidt Baking Distribution, LLC*, 162 F.4th 354 (2d Cir. 2025), applied that holding to reject the same corporate-form argument Bimbo raises here, on virtually identical facts involving the same kind of bread delivery drivers. *Silva* held that looking to the substance of what an agreement requires, not its formal attributes, is what *New Prime* commands — and that a single-member LLC agreement remains a contract of employment where the individual worker personally performs the work and personally guarantees performance. Every factor *Silva* found dispositive is present here. A contrary rule would hand every employer a one-step method to defeat Section 1 by requiring its

13

drivers to incorporate – precisely the loophole courts have uniformly refused to create.

Bimbo's principal cases, *Amos* and *Fli-Lo Falcon*[6], do not rescue it. Both involved substantial corporate entities with real independent workforces invoking the exemption for themselves as businesses – not individual workers suing in their own names. The district court in *Fli-Lo Falcon* recognized that its holding does not reach individual workers who file suit in their individual capacity. That is this case.

**Second,** as to Hastings, the arbitration clause Bimbo seeks to enforce is part of Hastings' Distribution Agreement, not his Settlement Agreement. The Settlement Agreement's own language resolves Bimbo's second argument. Bimbo paid Hastings $1,000 in separate consideration specifically "in exchange for [his] agreement […] to amend his current Distribution Agreement to incorporate the Mandatory Dispute Resolution Agreement attached hereto as Exhibit A (the 'MDRA')." JA107. The integration clause confirms that the Settlement Agreement "does not modify the Distribution Agreement except with regard to any amendment of the Distribution Agreement to include a [MDRA]." JA113. The parties thus expressed, in plain terms, that the MDRA was incorporated into the Distribution Agreement — not the Settlement Agreement. Under Massachusetts

---

[6]     *Amos v. Amazon Logistics, Inc.*,74 F.4th 591 (4th Cir. 2023) and *Fli-Lo Falcon LLC v. Amazon.com, Inc.*, 97 F.4th 1190 (9th Cir. 2024)

incorporation-by-reference doctrine, attaching a document as an exhibit does not make it an operative provision of the agreement to which it is appended.  Instead, an exhibit is only integrated into the agreement if the language the parties use "clearly" indicates such an intent. The Settlement Agreement contains no such language. Accordingly, Bimbo's only enforceable path to the arbitration clause runs through the Distribution Agreement, which is — as Bimbo tacitly concedes — a contract of employment.

Even if the MDRA were also an enforceable term of the Settlement Agreement, that agreement would itself fall within Section 1. The Settlement Agreement did not merely resolve a discrete past dispute; it amended and governed the ongoing terms of Hastings' delivery work with Bimbo. An agreement that expressly modifies the continuing terms of a transportation worker's services relationship is, in substance, a contract of employment — regardless of the label attached to it. Bimbo's argument that the word "settlement" removes it from Section 1's reach is the same form-over-substance move that *New Prime* and *Silva* have already rejected.

## STANDARD OF REVIEW

This Court reviews *de novo* the denial of a motion to compel arbitration based on the Section 1 exemption. *Cunningham v. Lyft, Inc.*, 17 F.4th 244, 249 (1st Cir. 2021). Where a "motion to compel arbitration [is] made in connection with a motion

to dismiss or stay," the court "draw[s] relevant facts from the operative complaint and the documents submitted to the district court in support of the motion to compel arbitration." *Waithaka v. Amazon.com, Inc.*, 966 F.3d 10, 13 n. 2 (1st Cir. 2020) (internal citations omitted). "[T]he party seeking to compel arbitration bears the burden of demonstrating 'that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, [and] that the other party is bound by that clause." *Aldea-Tirado v. PricewaterhouseCoopers, LLP*, 101 F.4th 99, 103 (1st Cir. 2024) (citations and internal quotations omitted).

## ARGUMENT

### I. Mr. Igwenagu's Distribution Agreement Is a "Contract of Employment" Under Section 1

The threshold question is straightforward: is Mr. Igwenagu's distribution agreement – which governs his delivery of bakery products throughout his territory, requiring 50 to 60 hours of personal work per week – a "contract of employment" within the meaning of FAA Section 1? Under four unanimous Supreme Court decisions, the answer is yes.

### A. The Supreme Court Has Repeatedly Rejected Efforts to Narrow Section 1's Reach

The Supreme Court has now construed Section 1's scope four times, and each time has "rejected efforts to cabin its reach." *Flowers Foods, Inc. v. Brock*, 608 U.S. ____, 146 S. Ct. 1358, 1363 (2026). The arc of those decisions is decisive

here. In *New Prime*, the Court held that "contract of employment" is not a term of art but a capacious phrase meaning "nothing more than an agreement to perform work"—one that encompasses independent contractors, not merely formal employees. *New Prime Inc. v. Oliveira*, 586 U.S. 105, 114–16 (2019). In *Saxon*, the Court held that a worker need not personally cross state lines. *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 459 (2022). In *Bissonnette*, the Court held that a worker need not be employed in the transportation industry. *Bissonnette v. LePage Bakeries Park St., LLC*, 601 U.S. 246, 255 (2024). And in *Brock* – a case involving a baked goods distributor operating under the same kind of distribution model Bimbo employs – the Court unanimously held that a Flowers Foods distributor who picks up products at an in-state warehouse and delivers them to local grocery stores is engaged in interstate commerce under Section 1. 146 S. Ct. at 1363.

Tellingly, like here, Flowers "conduct[ed] its business with Brock through a distribution agreement it ha[d] with an 'independently operated compan[y]' he own[ed]." *Id.* at *1365. The Court affirmed the denial of arbitration regardless. Bimbo's corporate-form argument is the latest effort to cabin Section 1's reach. It should meet the same fate.

**B. <u>Corporate Form Is Not the Test – Substance Controls</u>**

Bimbo's sole basis for distinguishing this case is that Mr. Igwenagu's distribution agreement runs nominally through his company, Cee Distribution LLC. That argument is foreclosed by *New Prime* itself.

The FAA exemption applies to "contracts of employment." In 1925, the word "employment" meant "work or business" and included a person's "regular occupation or business." *New Prime*, 588 U.S. at 115 n. 1. "Congress used the term 'contracts of employment' in a broad sense to capture ***any contract*** for the performance of *work* by *workers*."[7] So determining whether a contract is a "contract of employment" simply turns on whether it calls for the performance of work. As the Second Circuit has recognized, this is a substantive inquiry: *New Prime*'s "clear instruction" is for courts to look "to the substance of an agreement, not its formalities to determine whether it is a 'contract of employment[.]' " *Silva v. Schmidt Baking Distribution, LLC*, 162 F.4th 354, 362 (2d Cir. 2025). Courts must apply "substance over form." *Id.*

Indeed, *New Prime* proves the rule: there, the contract at issue was between two corporate entities—New Prime and the individual worker's LLC –just as Mr. Igwenagu's agreement is here. 586 U.S. at 108–09; *Silva*, 162 F.4th at 359 ("We are also mindful that the contract at issue in New Prime, like those before us here,

---

[7] *Id*. at 116 (emphasis supplied in part)

was signed by an individual worker on behalf of an entity that he formed at the direction of his employer"') (citing *Oliveira v. New Prime, Inc.*, 141 F. Supp. 3d 125, 128 (D. Mass. 2015)). The Court held that agreement a "contract of employment" without pausing over corporate form. *Id.*

The historical record confirms this understanding was not novel. Even at the time of the FAA's enactment, "contract of employment" encompassed agreements between fully autonomous business entities—including a sovereign tribe's agreement with a law firm partnership. *New Prime*, 586 U.S. at 115 n.2 (citing *Owen v. Dudley & Michener*, 217 U.S. 488, 494 (1910)). Moreover, as the Second Circuit observed, "judicial opinions from the time of the FAA's enactment provide numerous and diverse examples of courts using the term 'contract of employment' to refer to contracts for work between business entities; these include contracts between corporations, partnerships, and labor unions." *Silva*, 162 F.4th at 360 (collecting cases). [8]

Further, it bears noting that New Prime made ***virtually identical arguments to those made by Bimbo*** before the Supreme Court in its failed effort to overturn this Court's underlying ruling. For example, New Prime argued that the

---

[8]     *See also King v. Putnam Inv. Co.*, 248 U.S. 23 (1918) (land-owner's contract with a real estate brokerage company to find a purchaser for his land described as a "contract of employment"); Act of Aug. 24, 1921, ch. 89, 42 Stat. 192, 192 ("That no part of this sum shall be used to pay the compensation of any attorney, regular or special, for the United States Shipping Board or the United States Shipping Board Emergency Fleet Corporation unless the contract of employment has been approved by the Attorney General of the United States[.]").

agreements at issue were not "contracts of employment." It contended that its "Operating Agreements—contractual arrangements between New Prime, Inc. and Hallmark Trucking LLC" (the worker's corporate entity) are not "contracts of employment" because "[t]hey permit [the worker] either to 'drive the Equipment Yourself,' 'employ . . . drivers for the Equipment,' or 'lease drivers for the Equipment.'" *See* New Prime's SCOTUS Brief at pp. 33-34 (citations to J.A. omitted).[9] That made no difference to the Supreme Court in its analysis of the Section 1 exemption, and so there is no reason it should here.

Here, Bimbo does not dispute that Mr. Igwenagu's agreement requires work to be performed, or that he personally performed it 50 to 60 hours a week. The corporate form of one contracting party does not transform what is substantively a worker's agreement to perform transportation work into something else. Corporate form has never been the test. Bimbo imports a limitation the statute does not contain.

## C. Bimbo's Concession as to Hastings Confirms That Corporate Form Is Irrelevant

The arbitrariness of Bimbo's rule is exposed by its own brief. Bimbo's two issues on appeal are asymmetric in a revealing way. As to Hastings, Bimbo does **not** argue that his Distribution Agreement – signed by him individually, not

---

[9]      Available at https://www.supremecourt.gov/DocketPDF/17/17-340/46676/20180514134044965_No.%2017-340%20New%20Prime%20-%20Brief%20for%20Petitioner.pdf (last accessed June 17, 2026).

through any LLC – is anything other than a contract of employment of a transportation worker. Bimbo contests only the settlement-agreement question as to Hastings. That omission is a concession: Hastings' individual-capacity Distribution Agreement is, as Bimbo implicitly acknowledges, a contract of employment.

Now consider what Bimbo must also concede about Igwenagu. Hastings and Igwenagu do the same job. They drive the same types of routes, deliver the same Bimbo products, serve the same retail customers, work the same 50 to 60 hours per week, and operate under materially identical Distribution Agreements. The only difference between their agreements—on the contract-of-employment question—is that Igwenagu's bears the name of Cee Distribution LLC at the top. Under *New Prime*'s directive to focus on "the performance of work by workers," 586 U.S. at 116, that difference is legally irrelevant. Two workers performing identical work cannot have different rights under Section 1 based solely on the name printed on their paperwork. That is form over substance, pure and simple.

### D. <u>**Bimbo's Textual Argument Fails for the Same Reason New Prime's Did**</u>

Bimbo's statutory construction argument follows the same path the Supreme Court already rejected in *New Prime*. There, New Prime attempted to "shift the debate" from the term "contracts of employment" to the word "employee," arguing the exemption applied only to traditional employment relationships. 586 U.S. at

116. The Court rejected that effort, holding that "a contract of employment did not necessarily imply the existence of an employer-employee or master-servant relationship." *Id.* at 118.

Here, Bimbo seeks to shift the debate from "contracts of employment" to the preposition "of" – arguing that "contracts of employment of seamen, railroad employees, or any other class of workers" must mean contracts *with* those workers as parties, thereby importing a requirement that the contracting party be an individual. But this reading cannot survive *New Prime*: if "contracts of employment" does not necessitate an employer-employee relationship, then the worker categories that follow – "seamen, railroad employees, or any other class of workers" – cannot be read to impose one either.

Bimbo's reading also fails on its own syntactic terms. As the Second Circuit succinctly held in rejecting the identical argument: "Congress specifically enacted the phrase 'contracts of employment *of*' workers, not 'contracts of employment *with*' workers." *Silva*, 162 F.4th at 360. [10]

---

[10] Bimbo's contrary reading leans heavily on the Supreme Court's statement in *Saxon* that Section 1 exempts "only contracts with transportation workers." *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 458 (2022). But that phrase is a passing characterization in an opinion addressing a different issue. The question in *Saxon* was whether a ramp supervisor who loaded cargo belonged to a "class of workers engaged in… interstate commerce," *id.* at 453 — not whether a contract must name the worker as a party. The Court had no occasion to parse "of" versus "with," and dicta describing the exemption in shorthand cannot bear the interpretive weight Bimbo places on it especially in view of the Supreme Court's opinion in *New Prime* that more fully analyzed the meaning of "contracts of employment" under Section 1.

That distinction is deliberate. Congress knew how to use "with" to identify the specific parties to an agreement when it meant to do so. *See, e.g.,* Transportation Act of 1920, ch. 91, § 400, 41 Stat. 456, 475 ("nothing in this Act shall be construed to prevent telephone, telegraph, and cable companies from entering into contracts *with* common carriers for the exchange of services"); Act of July 2, 1890, ch. 647, § 1, 26 Stat. 209 (codified at 15 U.S.C. § 1) ( "Every contract . . . *with* foreign nations, is hereby declared illegal"); Acts of Mar. 3, 1871, ch. 120, § 71, 16 Stat. 544 ("Contracts *with* Indian Tribes or Indians") (emphasis added to all). Its choice of "of" instead signals a different purpose: to describe a *category* of contracts[11]—those for the performance of transportation work—rather than to specify with whom such a contract must be made.

Bimbo cherry-picks one of more than a dozen definitions of the word "of" to craft its inventive (but wrong) interpretation of Section 1's exemption. Other definitions of "of" from the 1920s – including "relating to," "connected to," and

---

[11]    *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001) ("The FAA exemption's residual clause is "controlled and defined by reference to the enumerated **categories** *of workers* which are recited"); *Willis v. Dean Witter Reynolds, Inc.*, 948 F.2d 305, 311 (6th Cir. 1991) ("…although Congress passed the FAA to ensure that courts honor the contractual agreement of parties who choose to resolve their disputes by arbitration, […] it limited the scope of the Act by creating a **category of contracts** not subject to the Act's strictures") (citation omitted) (emphasis added); *In re Grice*, 974 F.3d 950, 953 (9th Cir. 2020) (the FAA "exempts from its coverage 'contracts of employment' of **three categories** of workers: 'seamen,' 'railroad employees,' and a residual category comprising 'any other class of workers engaged in foreign or interstate commerce.'") (emphasis added).

"concerning"[12] – align with the actual meaning of the statutory text:  that the exemption covers various categories of contracts pertaining to the performance of transportation work.

As the Court held in *New Prime*, "Congress used the term 'contracts of employment' in a broad sense to capture ***any contract*** for the performance of *work by workers*." 586 U.S. at 121 (emphasis supplied in part). Mr. Igwenagu's distribution agreement is exactly that. Section 1 applies.

### E. **Bimbo's Cases Are Distinguishable: They Involved Corporate Entities With Substantial Workforces Suing as Plaintiffs, Not Individual Workers.**

Bimbo relies primarily on *Amos v. Amazon Logistics, Inc.*, 74 F.4th 591 (4th Cir. 2023), and *Fli-Lo Falcon LLC v. Amazon.com, Inc.*, 97 F.4th 1190 (9th Cir. 2024). Neither case supports its position here. In *Amos*, a corporate entity claiming to be a "transportation worker" sued in its own name despite having "several hundred delivery drivers on its payroll." 74 F.4th at 597. Even so, the court concluded that the company did not qualify for the FAA Section 1 exemption because it was "not some legal fiction existing only to shield Amazon from unwanted liabilities." *Id*.

In *Fli-Lo Falcon*, similarly, a corporate entity with significant business operations attempted to invoke the exemption for itself as a business. But, the

---

[12]     Webster's New International Dictionary 1492 (1923).

concurrence there acknowledged the concern that companies could "contract around the FAA's exemption by forcing their transportation workers to create sham corporations, then contracting with those corporations rather than employing the workers directly." *Fli-Lo Falcon*, 97 F.4th at 1202–03 (H.A. Thomas, Circuit Judge, concurring).

Those cases properly held that substantial corporate entities cannot themselves be "transportation workers." But "both the *Fli-Lo* and *Amos* courts recognized that there may be 'circumstances under which a business entity could qualify for the transportation worker exemption.' " *Silva,* 162 F.4th 354, at 363 (citing and quoting *Fli-Lo*, 97 F.4th at 1202 (Thomas, J. concurring) and citing *Amos*, 74 F.4th at 597). The district court in *Fli-Lo Falcon* said exactly that, distinguishing cases where individuals "filed suit in their individual capacity." *Fli-Lo Falcon, LLC v. Amazon.com Inc.*, No. C22-441-RSM-MLP, 2022 WL 4451273, at *6 (W.D. Wash. Sept. 8, 2022).

Here, individual natural persons bring wage and hour claims in their own names. That is precisely the case the *Fli-Lo Falcon* district court said its holding did not reach. Moreover, unlike in *Fli-Lo* and *Amos*, Bimbo's requirement that drivers like Igwenagu contract with the company through LLC's serves no legitimate purpose: it is only a means to attempt to evade the FAA's exemption and state and federal wage and hour laws.

In contrast, a recent decision from this Circuit – *Martins v. Capstone Logistics, LLC*, No. 1:24-cv-10357-MJJ, 2026 WL 252401 (D.Mass. Jan. 30, 2026) – squarely addressed this issue on similar facts. As here, the driver in *Martins* was required to contract through an LLC that was indistinguishable from the driver himself, personally performed all delivery services, and the LLC existed for no apparent purpose other than to contract around the FAA's exemption. *Id.* at *9. On those facts, the court had no difficulty concluding that the agreement – though nominally between two business entities – constituted a contract of employment under Section 1. *Id*. at *10.

Other circuits confronting this exact situation — individual workers suing through single-person LLCs — have similarly rejected the approach of Bimbo's cited cases. In *Adler v. Gruma Corp.*, 135 F.4th 55 (3d Cir. 2025), the Third Circuit held that a distribution agreement signed through an LLC was still a "contract of employment" because the individual plaintiffs "contracted with Defendant to 'perform work' by distributing Defendant's food products." *Id.* at 69. The Third Circuit rejected the same formalistic "franchise agreement" between corporate entities argument Bimbo raises here, looking instead at the substance of what the agreement required. *Id.* at 62, 69.

In *Porteous v. Flowers Foods, Inc.*, 766 F. Supp. 3d 1093 (D. Or. 2025), the court similarly held a distribution agreement signed through a corporate entity was

a contract of employment because (1) the plaintiff was a natural person and (2) he personally guaranteed performance. *Id.* at \*1099. Both factors are present here. This Court's own decision in *Canales v. CK Sales Co., LLC*, 67 F.4th 38, 44 (1st Cir. 2023), identified the corporate-form argument as a separate, unpreserved issue—and did not adopt it. While the question remains nominally open in this Circuit, *New Prime, Silva*, and the weight of persuasive authority runs strongly against Bimbo's position.

Bimbo's main authority from within this Circuit, *Peltier v. Lepage Bakeries Park St. LLC*, 2025 WL 871603 (D.R.I. Mar. 20, 2025), carries little persuasive force. It conflicts with *Canales*' finding that bakery distributors who operated through corporate entities were exempt, 67 F.4th at 45–46, and the issuing court itself recognized the issue: it certified the question for immediate interlocutory appeal to this Court. *Peltier v. Lepage Bakeries Park St. LLC*, 2025 WL 1285992, at \*1 (D.R.I. May 2, 2025). Bimbo has requested that this appeal be heard by the same panel. 1st Cir. Dkt. (Jun. 4, 2026). The fate of the other district court decision Bimbo invoked below is instructive: the District of Connecticut's ruling in *Silva v. Schmidt Baking Distribution, LLC*, 732 F. Supp. 3d 194 (D. Conn. 2024)— which likewise held that distribution agreements signed through worker-formed entities were not "contracts of employment"—was certified for interlocutory

27

appeal and then *vacated* by the Second Circuit. 162 F.4th 354. *Peltier* rests on the same reasoning and awaits the same scrutiny in this Court.

### F. *Silva* **Is Directly on Point, Correctly Decided, and Should Be Adopted by This Court.**

The Second Circuit in *Silva v. Schmidt Baking Distribution, LLC*, 162 F.4th 354 (2d Cir. 2025), directly confronted and rejected Bimbo's categorical rule. There, as here, a bakery distribution company required its delivery drivers to incorporate and to sign distributor agreements — containing mandatory arbitration clauses — through their new corporate entities as a condition of continuing the same delivery work. The district court held those agreements were not "contracts of employment" because they were signed by business entities. The Second Circuit vacated.

"Following the clear instruction of the Supreme Court in *New Prime*," the court looked "to the substance of an agreement, not its formalities," and held that the record "unequivocally demonstrate[d]" that the worker-formed entities were "mere instrumentalities" created at the company's behest "to dress individual 'contracts of employment' in the garb of commercial transactions." 162 F.4th at 362, 365. The court reasoned that Congress enacted "contracts of employment *of*" workers, not contracts of employment "*with*" workers, and echoed the district court's own recognition — in certifying the appeal — that a contrary rule "creates a potential loophole that could undermine § 1's purpose." *Id.* at 361, 364 (quoting

28

*Silva*, 2024 WL 3566168, at *4). To hold otherwise, the court explained, "would allow employers to render the exception a nullity." *Id.* at 364.[13] That is exactly *New Prime*'s approach — asking whether the agreement governs "the performance of work by workers"— applied to the corporate-form context. *Silva* is correctly decided, and this Court should adopt it.

The key factors the *Silva* court found dispositive are present here. *First*, Bimbo requires new distributors to contract via a corporate or LLC form as a condition of contracting—a requirement it imposed only in recent years, after sustained scrutiny of its classification model. Hunt Decl. ¶¶ 26–28 (JA170); Hastings Decl. ¶ 19 (JA164). *Second*, the personal guarantee: just as in *Silva*— where the court called the personal-guarantee provisions "[s]ome of the most telling evidence" because they "blur[] the line between a supposedly business-to-

---

[13] Bimbo's charge that *Silva*'s approach is "amorphous" and breeds "complexity and uncertainty" under *Bissonnette* is wrong and actually cuts against its own position sharply. Bimbo's categorical rule — that an admitted transportation worker loses the exemption whenever the service contract they work under is signed through a business form — hands every employer a one-step method to defeat Section 1 by requiring its drivers to incorporate, which is the "loophole that could undermine § 1's purpose" that courts have warned against. *Silva*, 162 F.4th at 362 (citation and internal quotation omitted). In any event, Plaintiffs prevail under any formulation: Igwenagu is a natural person who personally performs the work, personally guaranteed performance, and signed Bimbo's service contract through a single-member entity, as Bimbo would not allow him to do so individually whether or not he desired. The Court need not adopt any multifactor balancing to rule where any one of these facts should be adequate. Nor does Bimbo's invocation of corporate-separateness and veil-piercing cases, *see* Br. at 31–33, bear on the analysis. Construing whether an agreement is a "contract of employment" under Section 1 is a question of statutory interpretation, not an invitation to disregard a corporation's separate existence; Plaintiffs do not ask the Court to pierce Cee's veil, and the "rare" standards governing that distinct doctrine are beside the point.

business contract and an agreement for personal services," 162 F.4th at 365—

Igwenagu personally and unconditionally guaranteed Cee Distribution LLC's

performance. ECF 15-1 at 35 (JA85). *Third*, the substance of the work: Igwenagu

personally spends 50 to 60 hours per week delivering Bimbo products along

Bimbo-designated routes to Bimbo-designated retailers at Bimbo-set prices, under

Bimbo supervision and subject to Bimbo discipline. Igwenagu Decl. ¶¶ 10–19

(JA175); ECF 1 ¶¶ 27–38. *Fourth*, the nature of the entity: Cee Distribution LLC is

a single-member entity, not a sizeable enterprise with a large workforce—the very

feature that distinguished *Amos* and *Fli-Lo Falcon* in *Silva*'s analysis. 162 F.4th at

366–67.

The Supreme Court's recent actions reinforce *Silva*'s correctness. In *Brock*,

the Court itself cited *Silva*'s holding for "single-employee corporations" against

*Fli-Lo Falcon*'s holding for "two business entities" as the competing approaches in

the lower courts. *Flowers Foods, Inc. v. Brock*, 608 U.S. ___,  146 S.Ct. 1358

(2026) (comparing *Fli-Lo Falcon*, 97 F.4th at 1197–98, with *Silva*, 162 F.4th at

356–57). But the Court had no occasion to choose between them – nor to explain

whether any choice was even necessary.  Flowers raised its corporate-form

observation only "in passing" and "[did] not ask [the Court] to decide" its legal

significance, instead "ventur[ing] all upon one cast" on a bright-line state-lines rule

the Court rejected. *Id.* at 1366. The question therefore has not been squarely addressed.

But the trajectory of its Section 1 jurisprudence—four unanimous decisions, each rejecting an effort to cabin the exemption's reach—strongly counsels in favor of *Silva*'s approach. A categorical rule that nullifies the exemption whenever a company requires workers to incorporate is precisely the cabining the Court has uniformly refused to sanction. This Court should adopt *Silva*'s framework and affirm. *Silva* is factually and legally on par with this case, whereas the cases Bimbo relies on – whether correctly decided or not – are simply factually and legally inapposite.

### G. <u>Bimbo's Classification of Mr. Igwenagu as an Independent Contractor Also Dooms Its Position.</u>

Bimbo faces another obstacle. In *New Prime*, the plaintiff was "at least on paper . . . not an employee; the parties' contracts label[ed] him an independent contractor." 586 U.S. at 108. The Supreme Court nonetheless held that "contracts of employment" encompassed independent contractor relationships. *Id.*

The parallel here is exact. Like the contract in New Prime, Igwenagu's Distribution Agreement expressly labels him an independent contractor — and does so not only with respect to his LLC, Cee Distribution, but also as to Mr. Igwenagu personally. JA 57, Igwenagu Distribution Agreement ("It is the essence of this Agreement that DISTRIBUTOR and Guarantor, and their employees and

contractors, if any, be independent contractors for all purposes[.]"). And as here, Bimbo contends that Igwenagu is properly classified as an independent contractor. Bimbo cannot claim that Plaintiffs are independent contractors while simultaneously contorting that very label to evade *New Prime*'s holding that transportation workers who are "on paper" independent contractors are nonetheless covered by "contracts of employment" exempt from the FAA.

## II. The Arbitration Agreement Signed By Hastings Is Part Of His Distribution Agreement, Not The Settlement Agreement – Either Way, Both Are Contracts Of Employment

Bimbo argues that Hastings' arbitration agreement cannot be a "contract of employment" because it is part of his settlement agreement and Bimbo is seeking to enforce it (as opposed to Hastings' Distribution Agreement). This is a ruse.

### A. The Arbitration Agreement Is Part Of Hastings' Distribution Agreement, Not His Settlement Agreement

Bimbo's argument regarding Hastings' Settlement Agreement collapses under light scrutiny. The entire theory rests on a flawed chain: Hastings signed a settlement agreement, that agreement contains an enforceable arbitration clause, Bimbo may invoke it, and the agreement falls outside the "contracts of employment" exempted by FAA Section 1. But the argument fails at the threshold — the arbitration clause Bimbo seeks to enforce is part of Hastings' Distributor Agreement, not his Settlement Agreement.

Hastings' Settlement Agreement expressly references Hastings' Distribution Agreement with Bimbo numerous times (JA106-107). It then expressly reflects that Bimbo paid Hastings an additional $1,000 in consideration under Section 2(c), separate from the consideration paid to settle legal claims set forth in Section 2(a), specifically "in exchange for [Hastings's] agreement to amend his current Distribution Agreement to incorporate the Mandatory Dispute Resolution Agreement attached hereto Exhibit A (the 'MDRA')." JA107 at § 2(c). Bimbo seizes on the fact that the parties attached the MDRA as Exhibit A to the Settlement Agreement to argue that it was incorporated as an enforceable term of Settlement Agreement. But that is not how incorporation works.

Under Massachusetts law,[14] whether exhibits to an agreement are incorporated as enforceable terms of the agreement turns on application of the incorporation-by-reference doctrine. *NSTAR Elec. Co. v. Department of Public Utilities*, 968 N.E.2d 895, 905 (Mass. 2012) ("We turn now to the proper application of Massachusetts contract law to the question whether the December Settlement incorporates by reference any of its exhibits").[15] "Incorporation by

---

[14] *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (when ruling on an arbitration agreement's meaning, courts "should apply ordinary state-law principles").

[15] *See also Detroit Pub. Schs. Program Mgmt. Team v. Valley Forge Ins. Co.*, 483 F. App'x 150, 152–53 (6th Cir. 2012) (citation and internal quotation marks omitted) (collecting cases) ("That a document is attached to a contract does not conclusively make it part of the contract, particularly where the contract expressly incorporates certain… documents, but does not incorporate the document in question," and upholding ruling that exhibit attached to contract was not part of the contract).

reference is a common tool in the drafting of contracts." *Id*. (citations omitted). But "the language used in a contract to incorporate extrinsic material by reference ... must clearly communicate that the purpose of the reference is to incorporate the referenced material into the contract (rather than merely to acknowledge that the referenced material is relevant to the contract, e.g., as background law or negotiating history)." *Id*. (citation omitted).

Courts look to whether the referencing language uses phrasing "such as 'subject to,' 'pursuant to,' 'expressly limited by' or 'in accordance with,' or something similar, to clearly indicate that the contract includes those additional terms." *Holsum de P.R., Inc. v. Compass Indus. Grp. LLC*, No. 3:18-cv-02004-JAW, 2022 WL 3313742, at *6 (D.P.R. Aug. 11, 2022).

Applied here, those principles route the MDRA into the Distribution Agreement, ***not*** the Settlement Agreement. The terms of the Settlement Agreement are unambiguous, and unambiguous contract language "must be enforced according to those terms in accordance with their ordinary and usual sense." *Fed. Ins. Co. v. Commerce Ins. Co.*, 597 F.3d 68, 70 (1st Cir. 2010). The Settlement Agreement's operative language manifests intent to incorporate the MDRA into the *Distribution Agreement*: Bimbo paid Hastings $1,000 specifically "in exchange for [his] agreement… to amend his current Distribution Agreement to incorporate the [MDRA]," JA107, and the integration clause confirms that the Settlement

Agreement "does not modify the Distribution Agreement except with regard to any amendment of the Distribution Agreement to include a [MDRA]." JA113. That is the language of incorporation into the Distribution Agreement — an amendment to it—not into the Settlement Agreement.

The Settlement Agreement's integration clause underscores the same point. It provides that it "does not modify the Distribution Agreement *except with regard to any amendment of the Distribution Agreement* to include a Mandatory Dispute Resolution Agreement as may be set forth herein." JA113 at § 17 (emphasis added). The Settlement Agreement thus (1) confirms it leaves the Distribution Agreement intact and (2) carves out the MDRA as the one thing that was changing — an amendment to the ongoing distribution relationship.

The MDRA itself also confirms this. It is forward-looking, covering "any and all" disputes between Hastings and Bimbo, including claims arising out of "any assertion of any employment relationship"— not merely claims arising from the 2020 settlement (like some of the cases Bimbo cites emphasize), but disputes arising *from the ongoing distribution services relationship*. JA117, ECF 15-1, Exh. C at Exh. A § 13.6. It is, in substance and by express design, part of his Distribution Agreement. Indeed, it is difficult if not impossible to construe the MDRA separately

from the underlying Distributor Agreement it makes repeated reference to in referring to the "Distributor" and "Distribution Rights" throughout. JA116-120. [16]

On the other hand, there is no language indicating that the Settlement Agreement is "subject to" the MDRA or any similar language reflecting its incorporation. There is certainly nothing that "clearly communicate[s] that the purpose of the reference" to the MDRA "is to incorporate the referenced material into the" Settlement Agreement. *NSTAR*, at 905. [17]

To add an arbitration clause to Hastings' Distribution Agreement, the parties needed a written instrument memorializing it. They appended that instrument to the Settlement Agreement – but under settled incorporation principles, that placement does not transform the arbitration clause into an enforceable term of the Settlement Agreement. Instead, upon execution of the Settlement Agreement, the MDRA was incorporated into the Distribution Agreement by operation of basic contract law: an amendment does not create a new and independent contract but instead modifies the

---

[16] As this brief shows, the enforceability of arbitration agreements as applied to workers such as Hastings has been the topic of heavily contested litigation since the agreement was signed on November 2, 2020 (*see* JA114). The relatively modest consideration Bimbo paid to sign the arbitration agreement could have reflected the uncertainty on the enforceability of the arbitration agreement. Regardless of any underlying motivations, the statutory exemption governs the issue and since this agreement was signed this Court decided *Canales*, *supra*, putting to bed whether workers such as Hastings are covered by the exemption. They are.

[17] Bimbo cannot escape that plain language by invoking arbitration-specific rules of construction, because there are none: the Supreme Court has held that arbitration clauses receive no special, pro-arbitration construction, and that ordinary contract principles govern. *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022) ("[A] court may not devise novel rules to favor arbitration over litigation."); *see also Sparrow v. Demonico*, 461 Mass. 322, 327 (2012) (a settlement agreement is a contract governed by general contract-law principles).

original, which continues in force as amended. *See, e.g., Dansko Holdings v. Benefit Tr. Life Ins. Co.*, 991 F.3d 494, 503 (3d Cir. 2021) (holding that contract amendments integrate into original agreements rather than creating separate contractual relationships); *In re United Bancroft Hotel Co.*, 86 F. Supp. 690, 692 (D. Mass. 1949) (amendment was "intended to be incorporated into the previous [agreement] so as to form with it a single contract, not a new contract, but the previously existing contract continuing in a modified form"); *Connell v. Meritor Sav. Bank*, No. CIV. A. 90-5916, 1991 WL 25715, at *1 (E.D. Pa. Feb. 27, 1991) (treating an arbitration provision in an amended employment and severance agreement, similar to a settlement agreement amending employment terms, as "an amendment to the original [employment] agreement"); *Stinnett v. Damson Oil Corp.*, 648 F.2d 576, 582 (9th Cir.1981) ("Alteration of some details of a contract, while leaving undisturbed its general purpose…constitutes a mere modification of the original contract, and the latter remains in force as modified").

In short, there is no arbitration clause in the Settlement Agreement for Bimbo to enforce. Instead, Bimbo's only path to enforcing the MDRA runs through the Distribution Agreement, which is indisputably a "contract of employment" under the FAA.

**B. Even If the Arbitration Agreement Were Part Of The Settlement Agreement, It Would Still Constitute A Contract of Employment.**

While contract principles make clear that the arbitration clause is part of Hastings' Distribution Agreement, whether the Settlement Agreement incorporates the arbitration agreement or not is not outcome-determinative. Even if the MDRA were also an enforceable term of the Settlement Agreement, the result would be no different, because the Settlement Agreement is itself a contract of employment under Section 1 for the reasons explained above and below: it amends and governs the ongoing terms and conditions of Hastings's delivery work, not merely the resolution of a past dispute. Whether the MDRA is enforced through the Distribution Agreement or through the Settlement Agreement, the arbitration clause Bimbo seeks to enforce is contained in a contract of employment, and Section 1's exemption applies.

Bimbo's argument to the contrary reduces to this: because the document containing the MDRA is labeled a "Settlement Agreement" rather than a "Distribution Agreement," Section 1 does not apply. That is a pure form-over-substance argument — and it is the same argument courts have consistently rejected when applying Section 1. This Court in *Oliveira v. New Prime, Inc.*, 857 F.3d 7, 19 (1st Cir. 2017), affirmed by the Supreme Court, rejected the argument that the independent-contractor label in the contract itself was dispositive of whether it was a "contract of employment." *Silva* rejected the argument that LLC

labels remove distribution agreements from its reach. 162 F.4th at 362. The label on a contract does not determine its legal character under Section 1. What matters is the substance of the relationship it governs — and the MDRA here governs Hastings' ongoing employment relationship with Bimbo. *See* Id. ("Following the clear instruction of the Supreme Court in *New Prime*, we look to the substance of an agreement, not its formalities, to determine whether it is a 'contract of employment' for purposes of § 1 of the FAA."). [18]

Bimbo's reliance on *Williams v. Cigna Financial Advisors, Inc.*, 56 F.3d 656 (5th Cir. 1995) to argue otherwise is misplaced. In *Williams*, the arbitration clause was in a securities-industry registration form — a document entirely separate from and never integrated into any employment agreement. 56 F.3d at 660. The MDRA here is the opposite: the parties expressly described it as an amendment to the Distribution Agreement, paid separately for it, and incorporated it into that agreement by its express terms (not by mere reference as plaintiff argued in *Williams*). Unlike the free-standing registration form in *Williams*, the source of the arbitration obligation here is the Distribution Agreement as expressly amended—a contract of employment. Section 1's exemption applies.

---

[18]    Other aspects of the Settlement Agreement on its face impact the terms and conditions of the continuing working relationship. Discovery may show that Bimbo failed to meet those terms and that, in part, led to this litigation.  Yet at this stage, the fact that the agreement facially modified the services contract is what matters.

And the Second Circuit and New York Court of Appeals decisions Bimbo invokes in its introduction — for the proposition that "post-dispute settlement agreements are not FAA contracts of employment," (Br. at 1) — do not help it either. Those cases are *Harrington v. Atlantic Sounding Co.*, 602 F.3d 113 (2d Cir. 2010), and *Schreiber v. K-Sea Transport Corp.*, 879 N.E.2d 733 (N.Y. 2007), and they bear no resemblance to this one. Both arose under the *seamen* branch of Section 1 and involved an injured seaman who, after a workplace injury, signed a free-standing injury-claim arbitration agreement in exchange for cash advances against a Jones Act personal-injury claim.[19] Those agreements arose entirely out of a tort claim, resolved or addressed that injury claim, and governed nothing about the performance of work or any express amendment to a services contract. By their terms they reached only the injured worker's personal-injury claims, not any ongoing distribution or delivery relationship. The same is true in *Terrebonne v. K-Sea Transp. Corp.*, 477 F.3d 271, 279 (5th Cir. 2007) where the Court found the resolution of the personal injury ("maintenance and cure claims") were "separate from the actual employment *contract*." (emphasis in original).

---

[19] *See Harrington*, 602 F.3d at 116 (injured seaman signed agreement to arbitrate "any claim that could arise out of the personal injury/illness claim" in return for advances against settlement); *Schreiber*, 879 N.E.2d at 735–36 ("The issue is the validity of a seaman's agreement to arbitrate his Jones Act claim against his employer, where the agreement was made after the seaman was injured.").

Indeed, the seamen cases prove Plaintiffs' point rather than Bimbo's. In both *Harrington* and *Schreiber*, the courts held that Section 1 did *not* exempt the agreements from the FAA precisely because the post-injury claims-arbitration instruments were not contracts of employment — they did not engage anyone to perform work. That distinction — between an instrument that merely settles a worker's injury claim and one that amends the service contract — is exactly the line that defeats Bimbo here. The MDRA is not a release of a tort claim; it amends the agreement under which Hastings has performed Bimbo's delivery work since 2007 and reaches the parties' continuing work relationship. A settlement that "expressly governs certain aspects of an employee's continued employment with the employer" is "functionally and analytically indistinguishable from an employment contract for purposes of the FAA, since each regulates, to varying degrees, aspects of the parties' employment relationship." *Gillispie v. Village of Franklin Park*, 405 F. Supp. 2d 904, 908 (N.D. Ill. 2005). The seamen cases involved no amendment of a continuing service agreement, and they do not control here.[20]

---

[20] Both decisions predate *New Prime* and the line of authority applying it. *Harrington* (2010) and *Schreiber* (2007) were both decided without the benefit of the Supreme Court's instruction that "contract of employment" carries no specialized meaning and that courts must look to the substance of an agreement — whether it governs the performance of work—rather than its label or form. *New Prime*, 586 U.S. at 114; *Silva*, 162 F.4th at 360. Whatever force those decisions retain for the freestanding tort releases actually before those courts, they were not decided under— and supply no reason to disregard — the substance-over-form framework that now governs and that resolves Hastings's agreement, which amends and governs an ongoing relationship to perform delivery work.

And at bottom, the face of the MDRA solidifies the point and exposes the artificiality of Bimbo's standalone-document theory. The arbitration provision is not drafted to operate on its own; every operative term is keyed to the Distribution Agreement. Indeed, it is captioned and numbered as Article 13 — the same article and the same sections that house the arbitration clause in Bimbo's more recent distribution agreements,[21] demonstrating Bimbo's more recent Distributor Agreements contain similar if not identical provisions in Article 13 as those set forth in the Hastings amendment. It defines the contracting parties not as settling litigants but as "DISTRIBUTOR" and "COMPANY," and it reaches "any and all" disputes "arising out of or in any way relating to" the Distributor Agreement and "any assertion of any employment relationship between DISTRIBUTOR… and COMPANY" — the language of an ongoing distribution services relationship, not a narrow dispute. JA117, §13.6. Read as Bimbo would have it —as a standalone instrument unmoored from the Distribution Agreement — the MDRA's defined terms and cross-references have no referent, and the provision makes no sense. It can be understood only, and can only operate, as part of the Distribution Agreement it amends. The MDRA borrows its parties, its numbering, and its defined terms from the Distribution Agreement and is unintelligible without it. Where the seamen-case agreements stood alone, the MDRA cannot.

---

[21] JA78-81 (Igwenagu Distribution Agreement arbitration clause at Art. 13)

Therefore, even assuming the relevant arbitration clause lived in the Settlement Agreement (as opposed to the Distribution Agreement), it would still constitute a contract of employment.

## CONCLUSION

The district court correctly denied Defendants' motion to compel arbitration. Plaintiffs are transportation workers who spend 50 to 60 hours per week delivering Bimbo's bakery products as the final, indispensable leg of Bimbo's interstate distribution network. Bimbo's agreements requiring workers to perform services — whether signed individually or through a single-member LLC Bimbo required to sign the distribution service agreement — are contracts of employment under Section 1 of the FAA. The same is true of the arbitration provisions added to Hastings' amended Distribution Agreement, regardless of the document in which Bimbo originated the amendment to the service contract. The FAA does not apply — a conclusion the Supreme Court's unanimous decision in *New Prime* and the Second Circuit's correct application of *New Prime* in *Silva*, to nearly identical facts, places beyond serious doubt. This Court should affirm.[22]

---

[22] Appellees respectfully request oral argument. This appeal presents important questions concerning application of the FAA's Section 1 exemption, and oral argument may assist the Court in resolving those questions.

Respectfully submitted,

*/s/ Raven Moeslinger*

_____
Raven Moeslinger (Bar No. 1192738)
Ortiz & Moeslinger, P.C.
One Boston Place, Suite 2600
Boston, MA 02108
(617) 338-9400
rm@mass-legal.com

Zachary L. Rubin (Bar No. 1195210)
ZLR LITIGATION, PLLC
456 Glenbrook Rd., Suite 11 #638
Stamford, CT 06906
(203) 212-9983
zach@zlrlitigation.com

*Counsel for Appellees Chibuike Igwenagu and Brandon Hastings*

Dated:  June 18, 2026

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 10,355 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f), as counted by the word-count function of Microsoft Word, the word-processing program used to prepare this brief.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Times New Roman 14-point font.

**CERTIFICATE OF SERVICE**

I, Raven Moeslinger, hereby certify that on this 18th day of June, 2026, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Raven Moeslinger*

_____

Raven Moeslinger